[Cite as *State v. Mayhan*, 2022-Ohio-3533.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 21CAA110062 |
| | : | |
| BRANDON L. MAYHAN | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Delaware County Court
of Common Pleas, Case No. 21 CR I 02
0062

JUDGMENT:                    AFFIRMED

DATE OF JUDGMENT ENTRY:      September 30, 2022

APPEARANCES:

For Plaintiff-Appellee:              For Defendant-Appellant:

DAVE YOST                            JOEL M. SPITZER
OHIO ATTORNEY GENERAL                495 S. State St.
BRAD L. TAMMARO                      Marion, OH 43302
SPECIAL PROSECUTOR
30 E. Broad St., 23rd Floor
Columbus, OH 43215

*Delaney, J.*

{¶1} Appellant Brandon L. Mayhan appeals from the Judgment Entry of Prison Sentence of the Delaware County Court of Common Pleas dated October 21, 2021. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} In July 2018, Judge David Gormley of the Delaware County Court of Common Pleas sentenced appellant to a prison term of three years. At sentencing, Judge Gormley stated appellant could apply for judicial release prior to the expiration date of his prison term, but no promise was made that judicial release would be granted.

{¶3} After sentencing, the Ohio Department of Rehabilitation and Corrections determined appellant would serve his sentence at the Northeast Ohio Correctional Facility ("Northeast") in Youngstown, Ohio. At any given time, there are hundreds of inmates at Northeast serving sentences imposed in multiple jurisdictions throughout the state. At the time of these events, 9 inmates at Northeast were sentenced in the Delaware County Court of Common Pleas.

{¶4} Northeast has a prisoner telephone system maintained by an outside company, GTL. Prisoners log into a unique account and place a call; an automated message appears indicating to both the prisoner and the recipient of the call that all calls are monitored and recorded. From the period of May 1, 2020 through July 31, 2020, appellant made approximately 500 monitored phone calls. The recipients of appellant's calls included his girlfriend, his mother and father, and his grandmother.

{¶5} On June 4, 2020, Detective Chadwick Sloan of the Delaware County Sheriff's Office was contacted by an investigator at Northeast regarding a handwritten

document found at the prison. This document was admitted into evidence as appellee's Exhibit 1 and was referred to throughout trial as the "kill map." The map depicts a hand-drawn building labeled "New Deleware Co. Court House (*sic*)" and labels multiple floors, courtrooms, fans, and air ducts. A mark on the drawing is labeled "enter here." A circle depicts "Judge's seat" and "audience seating." This courtroom is labeled "Target" and a circular arrow designates "Kill point." A label on the drawing states, "Judge David M. Gormely (*sic*), Deleware Co. (*sic*), Common Pleas Court, Target, Court Room 2, 3rd Floor." Below the drawing, a handwritten timeline states, "In position @3:30 a.m., exicute target 7:32 a.m. sharp (*sic*), lock down sequence enitiates 7:37 AM 9MM Berretta with suppressor (*sic*), out of court building by 7:35."

{¶6} Detective Sloan showed Judge Gormley the "kill map" and asked if he had any idea who created it. At that time, Judge Gormley didn't know who created the map. He testified he was concerned, but he felt the matter was in capable hands because it was being investigated by Sloan and the U.S. Marshalls. Judge Gormley noted the map was found at Northeast, a facility located in Youngstown, but he did not personally designate where defendants from his courtroom served their sentences, and he was unaware of which defendants from his courtroom were sent to Northeast.

{¶7} Several weeks later, Judge Gormley received a handwritten letter postmarked June 15, 2020, with a return address of Northeast Ohio Correctional Facility, Youngstown, Ohio. The letter was signed by appellant and identified appellant by name and inmate number. In the three-page handwritten letter, appellant asked "Judge Gormely (*sic*)" why he denied appellant's motion for judicial release. Appellant expressed frustration because he needed to get out of prison to attend to family matters and

described the efforts he attempted to make in prison to improve himself, asking Judge Gormley "what more do you want from me."

{¶8} When Judge Gormley received the letter, the Youngstown return address caught his attention because Sloan was attempting to identify a Youngstown inmate. The judge gave the letter to his courtroom deputy, who provided it to Sloan, and appellant became the focus of the investigation into who created the "kill map."

{¶9} Before the letter was opened, the deputies put it through the courthouse scanner and opened it wearing gloves and masks in case it contained some type of contaminant.

{¶10} Appellee presented a timeline of appellant's pro se postconviction motions before Judge Gormley that purportedly led to creation of the "kill map." On or around March 31, 2020, appellant had filed a pro se Motion for Judicial Release before Judge Gormley. The judge testified that upon receipt, he would have reviewed the motion and appellant's Institutional Summary, or prison record, delineating appellant's work history, educational opportunities, and discipline while incarcerated.

{¶11} Judge Gormley denied the motion for judicial release via Judgment Entry filed on April 1, 2020.

{¶12} On or around May 27, 2020, appellant filed a second pro se Motion for Judicial Release before Judge Gormley. In this motion, appellant cited the Covid-19 pandemic and its effect on the prison population; appellant stated he has chronic asthma and serious breathing issues and Covid-19 "poses a risk to [his] very life," protesting that he "was not sentenced to the death-penalty."

{¶13} Judge Gormley denied appellant's second motion for judicial release via Judgment Entry filed on June 5, 2020.

{¶14} Appellant's signed letter to Judge Gormley and his unsuccessful motions for judicial release made him the focus of the "kill map" investigation. Sloan interviewed appellant and he admitted writing a letter to Judge Gormley, but denied that he wrote the letter postmarked June 15, 2020 because it was "too long." He denied creating the "kill map" and stated someone was attempting to set him up. He told Sloan he had never seen the "kill map" before.

{¶15} Sloan subpoenaed appellant's prison phone calls from GTL. A criminal analyst at the Delaware County Sheriff's Office downloaded appellant's calls and placed them on a disk for Sloan to listen to. On the calls, appellant is identified by name and inmate number. Sloan listened to the calls and created appellee's Exhibit 8, a transcript of select calls made by appellant. The following telephone calls were played for the jury and are summarized in pertinent part below.

{¶16} These calls contained the standard warning that calls are monitored and recorded by law enforcement.

{¶17} In a call with his father on May 9, 2020, appellant's father said the family wants him out of jail so he can go back to work. Appellant replied that he wanted the same thing, but "they don't like to let mother fuckers go because they like to make money on them" and he would only be released "if somebody went and put a gun to the judge's head and then forced him to let me out." Or, appellant suggested, "send him pictures of his fucking family tied up with duct tape over their mouths," and, "[t]hat judge lied to me anyway, he deserves it." His father asked what the judge lied about, and appellant

responded, "He lied and told me he would grant my judicial [release]." His father asked which judge grants judicial release, and appellant responded the same one that put him in prison.

{¶18} In a call with his mother on May 9, 2020 at 12:40, appellant stated the judge lied to him and when he gets out he "gotta beat his ass somewhere in the parking lot."

{¶19} In another call with his mother on May 27, 2020, appellant asked whether his mother "got a letter to the judge" and she said yes. On May 31, 2020, in another conversation with his mother, appellant's mother cautioned him to "not get [his] hopes up [about judicial release]" because he would be "devastated if they said no." Appellant responded, "* * * *If they say no they threatening my life, and they don't honor my life so I have to go after them and kill them. That's what that means, because of the Covid 19 shit there's an inmate in here that has it now, so if they don't give me my judicial [release] it means that they don't give a fuck that I am not doing life and they don't care if I get the shit and die, so they have to pay for it."

{¶20} On June 1, 2020, in a conversation with his mother, appellant mentioned a visit with his son was canceled by prison authorities and stated, "I just want to grab one of those pigs and ring their fuckin neck until their eyeballs pop out of their heads." His mother responded that the prison authorities didn't make the decision; the governor did. Appellant responded, "Well that's who I want to do it too, I wanna get him and the judge with a silencer, fuckin blow his brains out."

{¶21} On June 2, 2020, appellant's mother advised regarding judicial release, "It's denied." Appellant asked whether the decision was with prejudice, and said, "Man I'm about to shoot that judge, man I got to, I'm going to shoot him, I'm going to shoot him,

that's on my son I'm going to shoot him, so now you know I'm serious, that fucking bitch lied to me." Appellant's mother replied that this would cause more problems for appellant and result in more prison time, but appellant responded he would be on his best behavior going forward because he "has something up his sleeve," and "that judge lied to me and he's going to pay the price." His mother responded that the judge told appellant only that he would consider judicial release; he did not promise it would be granted. Appellant responded, "Man fuck him fuck him, he's a dead man walking."

{¶22} On June 5, 2020, appellant had a conversation with his grandmother and discussed the motion for judicial release. Appellant said he was getting aggravated about the denials and was "losing his fucking head." Further, "I'm ready to get out and do something to that judge, I really am." His grandmother responded that these statements were irresponsible and not worth appellant spending more time in prison, especially when he would eventually be released. Appellant responded that he wants revenge and feels nothing but rage and anger, which is all he can think about.

{¶23} On June 5, 2020, appellant again expressed rage in a conversation with his mother and said he was ready to do life in prison because the judge lied to him and he was ready to get out and do something to the judge.

{¶24} On June 11, 2020, in a conversation with his girlfriend, appellant expressed his frustration that everyone else was getting judicial release but him and he has an issue with the judge; "[b]asically he's gave me a death sentence by not releasing me. So you know something has to transpire from that."

{¶25} On June 19, 2020, in a conversation with his girlfriend, appellant vowed that he would "get [his] revenge on that judge one way or another."

{¶26} During his interview of appellant, Sloan asked whether he made "disturbing" comments about a judge during telephone calls. Appellant denied making such statements and repeated it was not him, someone was setting him up.

{¶27} At trial, Sloan noted appellant's handwriting in the letter to Judge Gormley appeared very similar to the handwriting on the "kill map" when placed side-by-side. Also, the judge's name was misspelled the same way in both: "Gormely." Sloan submitted the "kill map" and appellant's letter to BCI for handwriting analysis. Appellee's Exhibit 7 is the report from the BCI crime lab; it states there are "substantial similarities" between the letter and the "kill map," but the examination was limited because both items were not originals and there was a limited amount of handwriting on the "kill map."

{¶28} Appellant was charged by indictment with one count of retaliation pursuant to R.C. 2921.05(A), a felony of the third degree [Count I]; one count of intimidation pursuant to R.C. 2921.03(A), a felony of the third degree [Count II]; and one count of aggravated menacing pursuant to R.C. 2903.21(A), a misdemeanor of the first degree [Count III]. Appellant entered pleas of not guilty.

{¶29} The matter proceeded to trial by jury. Appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A) at the close of the evidence; the motion was overruled. Appellant was found guilty as charged upon Counts II and III (intimidation and aggravated menacing). He was found not guilty upon Count I (retaliation).

{¶30} The trial court ordered a pre-sentence investigation (P.S.I.) and scheduled the matter for sentencing. The trial court thereupon sentenced appellant to a prison term of 30 months upon Count II and 120 days upon Count III, to be served concurrently.

{¶31} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶32} "I. THE TRIAL COURT ERRED BY FAILING TO GRANT A JUDGMENT OF ACQUITTAL, PURSUANT TO CRIM.R. 29(A) ON THE AGGRAVATED MENACING AND INTIMIDATION CHARGES, AND THEREAFTER ENTERING A JUDGMENT OF CONVICTION OF THOSE OFFENSES AS THE CHARGES WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE."

{¶33} "II. THE JURY VERDICT OF GUILTY ON THE INTIMIDATION AND AGGRAVATED MENACING CHARGES WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."

{¶34} "III. THE TRIAL COURT ERRED BY FAILING TO GRANT A JUDGMENT OF ACQUITTAL, PURSUANT TO CRIM.R. 29(A) BECAUSE DELAWARE COUNTY, OHIO WAS NOT THE PROPER VENUE FOR THIS PROCEEDING."

**ANALYSIS**

I., II., III.

{¶35} Appellant's three assignments of error are related and will be addressed together. He argues that his convictions for intimidation and aggravated menacing are against the manifest weight of the evidence and are not supported by sufficient evidence. He further argues Delaware County was not the proper venue for his jury trial. We disagree.

{¶36} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio

St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶37} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶38} In Count II, appellant was convicted of one count of intimidation pursuant to R.C. 21.03(A), which states:

> No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, a party official, or an attorney

or witness involved in a civil action or proceeding in the discharge of the person's the duties of the public servant, party official, attorney, or witness.

{¶39} In Count III, appellant was convicted of one count of aggravated menacing pursuant to R.C. 2903.21(A), which states:

No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family. In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family, the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

{¶40} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Serious physical harm to persons" includes the following:          * * *

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(b)-(e).

{¶41} Appellant argues his convictions are not supported by sufficient evidence because the "kill map" and threats made during telephone conversations with family members "are too unequivocal, unconditional, and not immediate enough (*sic*)" to prove that he attempted to influence, intimidate, or hinder Judge Gormley in the discharge of his duties. Appellant cites our decision in *State v. Yambrisak,* 5th Dist. Richland No. 2012–CA–50, 2013–Ohio–1406, as an example of threats which are "unconditional, not immediate * * * not specific and * * * in no way hinder[ed] * * * or influence[d]" a public official in discharge of her duties. In that case, we found that racial slurs directed at a detective were not threatening and were merely "statements of [the defendant's] feelings and opinions." *Id.* at ¶ 33. With regard to a threat to "f* * * [the detective] up," we concluded that the choice of words was ambiguous and failed to convey a particular criminal act. *Id.* at ¶ 34.

{¶42} We find *Yambrisak* to be distinguishable from the instant case. In the phone calls corresponding with the timing of his pro se motions and letter, appellant made unequivocal threats to shoot the judge with a firearm equipped with a silencer. A detailed plan to carry out this scheme, however unlikely, is laid out in the "kill map." Appellant was one of only 9 inmates at Northeast with an interest in Delaware County in general and Judge Gormley in particular. Despite his denials, the jury could reasonably find appellant's handwriting and spelling errors in the letter were similar to the handwriting in the "kill map." All of appellee's exhibits corroborated the image of appellant as an incarcerated inmate with spiraling anxiety about the threat to his safety posed by Covid-19, anxiety which is evident in the letter, motions, and phone calls. Appellant was not simply another inmate who hoped to end his prison term early; he believed Judge Gormley essentially sentenced him to "death" because of the risk of Covid-19. *Yambrisak* is this inapposite to the instant case.

{¶43} Additionally, appellee points out the threats in the telephone calls were made when appellant believed the motions for judicial release were still pending, thus there is evidence in the record that the threats were made with the purpose to influence and/or intimidate Judge Gormley. Appellant made over 500 calls in the 3-month period covered by the GTL search warrant, and would have been warned on every call that the calls were monitored by law enforcement. There is sufficient evidence to permit a reasonable conclusion that appellant knew the threats would ultimately reach Judge Gormley and, in appellant's hopes, affect the outcome of his judicial release.

{¶44} Appellant argues his threats are conditional and do not pose an immediate risk, but he repeatedly told friends and family that he was obsessed with seeking revenge

against Judge Gormley and he intended to "keep his nose clean" in hopes that he would be released as soon as possible to put his plan into action.

{¶45} We find legally sufficient evidence to support appellant's convictions. Viewing the evidence in a light most favorable to appellee, we believe a rational trier of fact could have found the essential elements of intimidation and aggravated menacing proven beyond a reasonable doubt.

{¶46} Appellant further argues that appellee failed to prove Judge Gormley believed appellant would cause him serious physical harm. While it is true that the judge testified he knew the matter was being investigated and was in capable hands, he was also concerned enough to turn over appellant's letter to law enforcement. Judge Gormley testified that while the "kill map" was not an exact blueprint of his workplace, it was concerning because he was clearly identified as the target.

{¶47} Appellant also argues the jury could not reasonably find that he knew the threats would be conveyed to the judge. The aggravated-menacing statute does not require a threat to be made directly to the victim. *State v. Stutz*, 2nd Dist. No. 28705, 2020-Ohio-6959, 165 N.E.3d 821, ¶ 13, citing *State v. Tipton*, 2d Dist. Montgomery No. 28602, 2020-Ohio-3680, 2020 WL 3885907, ¶ 11. A threat "may be made indirectly if there is evidence to support the conclusion that the offender knew the threat would probably reach the victim." *Id.,* citing *State v. Scott*, 7th Dist. Mahoning No. 07 MA 152, 2009-Ohio-4961, 2009 WL 3003929, ¶ 20. The requirement of a probability that the threat will be conveyed to the victim stems from the "knowingly" mens rea, which requires proof that "the person's conduct probably will cause a certain result." *Id.*

{¶48} We find legally sufficient evidence to support a finding that appellant was aware his threats probably would reach Judge Gormley. *Stutz, supra,* at ¶ 14. Appellant threatened Judge Gormley to his family members repeatedly, even obsessively, while his pro se judicial release motions were pending. His family attempted to discourage his statements, to no avail. On each of the cited phone calls, the parties to the call were warned the calls were monitored and recorded. Appellant would have seen this warning on every one of the 500 calls he made just in the period covered by the search warrant. The record contains legally sufficient evidence to support a finding that appellant should have known that law enforcement would become aware of the threats and that they would reach Judge Gormley. *Id.*

{¶49} Finally, appellant argues his prosecution was improperly venued in Delaware County because the acts giving rise to the charges occurred at the Northeast Ohio Correctional Facility in Youngstown, Ohio. Venue is established under Article I, Section 10 of the Ohio Constitution, which requires criminal trials to be held in the "county in which the offense is alleged to have been committed." Likewise, R.C. 2901.12(A) requires criminal trials to be held "in the territory of which the offense or any element thereof was committed." This statute also allows offenses committed in other jurisdictions "as a part of a course of criminal conduct" to be tried "in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." R.C. 2901.12(H).

{¶50} In a menacing case, venue is proper where the offender made the threat or where the victim heard the threat. *State v. Stutz*, supra, 165 N.E.3d 821, ¶ 16; *State v. Dengg*, 11th Dist. Portage No. 2008-P-0063, 2009-Ohio-4101, 2009 WL 2488048, ¶ 34; *Fairfield v. McRoberts*, 100 Ohio App.3d 476, 478, 654 N.E.2d 370 (12th Dist.1995). In

the instant case, we agree with the trial court's assessment that venue is proper in either Mahoning or Delaware County. The trial court did not err in overruling appellant's Crim.R. 29 motion for acquittal on that basis.

{¶51} Appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, and venue was proper in Delaware County. Appellant's three assignments of error are overruled.

## CONCLUSION

{¶52} Appellant's three assignments of error are overruled and the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Baldwin, J., concur.